# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 15 2018, 8:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David V. Miller
DVM Law, LLC
Newburgh, Indiana

George C. Barnett, Jr.
Barnett Law, LLC
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Kirk D. Bagrowski
Hammond, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Amy K. Metz, as Mother and Next Friend of Kiara K. Metz, an incapacitated minor, | November 15, 2018 |
| *Appellant-Defendant,* | Court of Appeals Case No. 18A-CT-325 |
| v. | Appeal from the St. Joseph Circuit Court |
| Saint Joseph Regional Medical Center-Plymouth Campus, Inc.; Saint Joseph Regional Medical Center, Inc.; Joel Schumacher, M.D.; and Plymouth Family and Internal Medicine, | The Honorable John E. Broden, Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 71C01-1705-CT-233 |

**Tavitas, Judge.**

# Case Summary

Amy Metz, as mother and next friend of Kiara Metz, an incapacitated minor, appeals the trial court's dismissal of her complaint against the Saint Joseph Regional Medical Center-Plymouth Campus, Inc.; Saint Joseph Regional Medical Center, Inc.; Joel Schumacher, M.D.; and Plymouth Family and Internal Medicine (collectively, "Medical Providers"). We affirm.

# Issue

Metz raises several issues, which we consolidate and restate as whether the trial court properly determined that the Indiana Medical Malpractice Act governs Metz's claims against Medical Providers.

# Facts

In May 2017, Metz filed a complaint against Medical Providers alleging negligence and requesting punitive damages. Metz alleged that her daughter, Kiara, was born on August 6, 2004, at Saint Joseph Regional Medical Center-Plymouth Campus ("Plymouth Hospital") and that Dr. Schumacher was engaged to provide services, "including but not limited to the timely review of TSH Test Results regarding infants born at the Plymouth Hospital, and the timely communication of those results to the appropriate hospital office and to the parents of the said newborn infants." Appellants' App. Vol. II pp. 18-19. Metz alleged that a blood sample was obtained from Kiara by the delivery team and was sent to the Indiana University Newborn Screening Laboratory

("Laboratory"). The Laboratory issued a written report on August 16, 2004, which it sent to Plymouth Hospital and Dr. Schumacher. The written report provided that Kiara's "TSH" was "abnormal borderline." *Id.* at 29. The report noted: "The newborn screen was considered abnormal and a recollection of an additional blood spot specimen is necessary to further evaluate this infant." *Id.* Medical Providers did not report the test results to Metz or take action to retest Kiara. Metz alleges that she called Dr. Schumacher's office on August 20, 2004, regarding the test results and was informed by office staff that the results were normal.

[4]     On August 31, 2004, the Laboratory again sent a letter to the Plymouth Hospital and Dr. Schumacher noting that it had not received "follow-up . . . as is required by ISDOH . . . ." *Id.* at 30. Medical Providers again did not contact Metz. On September 25, 2004, Metz received a copy of a letter from the Laboratory to Dr. Schumacher dated September 21, 2004. Kiara's pediatrician, Dr. Robert Kolbe, then requested copies of the records from Dr. Schumacher and obtained additional testing of Kiara, which demonstrated that Kiara has hypothyroidism. According to Metz, "if hypothyroidism is identified within two to three weeks of a child's birth, damaging developmental effects of hypothyroidism can be prevented by the administration of manufactured medicines containing substances that provide the newborn with substitutes for the inadequate production of TSH by the infant's thyroid gland." *Id.* at 21. Metz alleged that Kiara has suffered "numerous irreversible consequences." *Id.* at 25.

[5]     Medical Providers filed a motion to dismiss pursuant to Indiana Trial Rule 12(B)(1) and Indiana Trial Rule 12(B)(6). Medical Providers argued that the matter was barred by the statute of limitations set out in the Indiana Medical Malpractice Act ("MMA"). Medical Providers argued that the alleged acts and omissions constitute claims of medical negligence rather than general negligence, and thus, the MMA applies. According to Medical Providers, Metz failed to file a timely proposed complaint with the medical review panel and failed to file a claim before Kiara's eighth birthday as required by the MMA.

[6]     Metz responded by arguing that the MMA did not apply because Medical Providers "simply failed to perform an administrative duty to read and report the critical information in those letters." *Id.* at 76. Metz contended that the "MMA cannot, by any stretch of its statutory language, be interpreted to include the failure to perform a purely administrative act." *Id.* According to Metz, her claims "sound[] in common law negligence against the [Medical Providers]." *Id.* at 80.

[7]     In January 2018, the trial court granted Medical Providers' motion to dismiss pursuant to both Trial Rule 12(B)(1) and Trial Rule 12(B)(6) as follows:

> 11.    [ ] [T]his court found the discursive analysis as set out in *Terry v. Community Health Network*, 17 N.E.3d 389 (Ind. Ct. App. 2014) and *Robertson v. Anonymous Clinic*, 63 N.E.3d 349 (Ind. Ct. App. 2016) to be most helpful. Both cases emphasized a focus on "whether the claim is based on the provider's behavior or practices while acting in his professional capacity as a provider of medical services." *Terry*, [17 N.E.3d] at 393 (citing

*Madison Ctr, Inc., v. R.R.K.*, 853 N.E.2d 1286, 1288 (Ind. Ct. App. 2006). Both cases then emphasized that the court's true focus must be on whether the issues are capable of resolution without referring to the medical standard of care; if so, the claims are not subject to the MMA. *Robertson*, [63 N.E.3d] at 360.

12. With that analysis in mind, the focus shifts to the actual text of the allegations in Plaintiff's Complaint and the contents of the designated evidence regarding the actual acts of alleged negligence. As discerned by this court, the acts of alleged negligence asserted by Plaintiff are as follows: A. Neither Dr. Schumacher nor any other named Defendant reported the abnormal TSH Test Results information to Plaintiff or anyone associated with Kiara's parents; B. Neither Dr. Schumacher nor any other named Defendant caused Kiara to be retested as required by the August 16 report; C. On or about August 20, 2004, Plaintiff was advised by a staff person of Dr. Schumacher that the results of Kiara's infant blood screen were all normal; D. Defendants failed to provide Plaintiff with a copy of or advise her of the contents of an August 31, 2004 letter from the IU Lab advising Defendants that the Lab had yet to receive a follow up blood sample as requested; E. Plaintiff was not made aware of the abnormal test result until September 25, 2004 when she received a letter from the IU Infant Screening Laboratory; F. Plaintiff did not receive an actual copy of the August 31, 2004 letter from the IU Lab until late September or early October of 2004; G. Plaintiff contends in paragraph 31 of her Complaint that these failures were purely the result of lack of proper attention and/or administrative or clerical failures, none of which involved the exercise of medical skill or judgment.

13. This court finds that the alleged acts of negligence set out above do have to do with the provider's behavior or practices while acting in his professional capacity as a provider of medical services. Further, there is a causal connection between the conduct complained of and the nature of the patient-health care provider relationship. The court also notes that the test involved revealed a "borderline abnormal" reading. Such a reading makes the medical issues more complicated and would involve an analysis of the medical standard of care and be outside the common knowledge of a lay juror. In the end, this court cannot conclude Defendants' alleged acts of negligence are demonstrably unrelated to the promotion of the Plaintiff's health or not involving the provider's exercise of professional expertise, skill, or judgment. Therefore, Plaintiff's claim is governed by the terms and provisions of the MMA.

Appellants' App. pp. 14-15.

## Analysis

Metz appeals the trial court's grant of Medical Providers' motion to dismiss pursuant to both Indiana Trial Rule 12(B)(1) and Indiana Trial Rule 12(B)(6). Trial Rule 12(B)(1) addresses the "[l]ack of jurisdiction over the subject matter." In reviewing a motion to dismiss for lack of subject matter jurisdiction pursuant to Trial Rule 12(B)(1), the relevant question is whether the type of claim presented falls within the general scope of the authority conferred upon the court by constitution or statute. *Robertson v. Anonymous Clinic*, 63 N.E.3d 349, 356 (Ind. Ct. App. 2016), *trans. denied*. A motion to dismiss for lack of subject matter jurisdiction presents a threshold question with respect to a court's power

to act. *Id.* "The standard of review for a trial court's grant or denial of a 12(B)(1) motion to dismiss for lack of subject matter jurisdiction is 'a function of what occurred in the trial court.'" *Berry v. Crawford*, 990 N.E.2d 410, 414 (Ind. 2013) (citing *GKN Co. v. Magness*, 744 N.E.2d 397, 401 (Ind. 2001)), *reh'g denied*. Where the facts before the trial court are not in dispute, the question of subject matter jurisdiction is one of law, and we review the trial court's ruling de novo. *Id.* Likewise, when reviewing a final judgment, we review all conclusions of law de novo. *Id.* In the appeal from a trial court's grant of a pretrial motion to dismiss under Trial Rule 12(B)(1), we accept as true the facts alleged in the complaint. *State ex rel. Zoeller v. Aisin USA Mfg., Inc.*, 946 N.E.2d 1148, 1149-50 (Ind. 2011), *reh'g denied*.

[9] Trial Rule 12(B)(6) addresses the "[f]ailure to state a claim upon which relief can be granted." A motion to dismiss under Trial Rule 12(B)(6) tests the legal sufficiency of the plaintiff's claim, not the facts supporting it. *Bellwether Properties, LLC v. Duke Energy Indiana, Inc.*, 87 N.E.3d 462, 466 (Ind. 2017). A dismissal under Trial Rule 12(B)(6) is improper "'unless it appears to a certainty on the face of the complaint that the complaining party is not entitled to any relief.'" *Id.* (quoting *State v. American Family Voices, Inc.*, 898 N.E.2d 293, 296 (Ind. 2008), *reh'g denied*). We review a Trial Rule 12(B)(6) dismissal de novo, giving no deference to the trial court's decision. *Id.* In reviewing the complaint, we take the alleged facts to be true and consider the allegations in the light most favorable to the nonmoving party, drawing every reasonable inference in that party's favor. *Id.* A complaint states a claim on which relief can be granted

when it recounts sufficient facts that, if proved, would entitle the plaintiff to obtain relief from the defendant. *Id.*

[10] The issue in this appeal is whether Metz's allegations against Medical Providers are claims of general negligence or are claims covered by the provisions of the MMA. If the claims against Medical Providers are not subject to the MMA, they are claims of general negligence. *See Robertson*, 63 N.E.3d at 357. This distinction is important because the MMA requires the presentation of the proposed complaint to a medical review panel before an action may be commenced in a court in Indiana, and Metz did not present the claim to a medical review panel. *See* Ind. Code § 34-18-8-4. "Essentially, the [MMA] grants subject matter jurisdiction over medical malpractice actions first to the medical review panel, and then to the trial court." *H.D. v. BHC Meadows Hospital, Inc.*, 884 N.E.2d 849, 853 (Ind. Ct. App. 2008), *reh'g denied, trans. denied*; *see also B.R. ex rel. Todd v. State*, 1 N.E.3d 708, 713 (Ind. Ct. App. 2013) ("Simply said, the [MMA] grants subject matter jurisdiction over medical malpractice actions first to the medical review panel, and then to the trial court."), *trans. denied*.

[11] Moreover, "[a] motion to dismiss for failure to state a claim on which relief may be granted may be an appropriate means of raising the statute of limitations." *Chenore v. Plantz*, 56 N.E.3d 123, 126 (Ind. Ct. App. 2016). "When the complaint shows on its face that the statute of limitations has run, the defendant may file a Trial Rule 12(B)(6) motion." *Id.* The MMA imposes a two-year statute of limitations but does allow claims on behalf of minors to

proceed if the claim is filed before the minor's eighth birthday. *See* Ind. Code 34-18-7-1(b) ("A claim, whether in contract or tort, may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect, except that a minor less than six (6) years of age has until the minor's eighth birthday to file."). Here, Metz did not file her complaint until after Kiara's twelfth birthday. In an action for general negligence, however, the statute of limitations would be tolled until two years after Kiara was eighteen years old. *See* Ind. Code 34-11-6-1 ("A person who is under legal disabilities when the cause of action accrues may bring the action within two (2) years after the disability is removed."). Consequently, we address whether Metz's claims fall within the MMA.

[12] "[T]he MMA was a legislative response to escalating problems in the malpractice insurance industry, with physicians being fearful of exposure to malpractice claims and, further, being unable to obtain adequate malpractice insurance." *Preferred Prof'l Ins. Co. v. West*, 23 N.E.3d 716, 726 (Ind. Ct. App. 2014), *trans. denied*. "By providing some measure of protection to health care providers, the MMA was designed to preserve health care services available to the community." *Id.* The statutory procedures for bringing a medical malpractice action are in derogation of common law, and as such, they are to be strictly construed against limiting a claimant's right to bring suit. *Id.* at 726-27. When the legislature enacts a statute in derogation of common law, we

presume that the legislature is aware of the common law and does not intend to make any change beyond what is declared in express terms or by unmistakable implication. *Id.* at 727.

[13] The MMA defines "malpractice" as "a tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." Ind. Code § 34-18-2-18. "Health care" is "an act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." I.C. § 34-18-2-13. The MMA does not necessarily apply to all cases where a health care provider is a party. *West*, 23 N.E.3d at 727.

[14] "Indiana courts understand the [MMA] to cover 'curative or salutary conduct of a health care provider acting within his or her professional capacity,' but not conduct 'unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment.'" *Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182, 185 (Ind. 2011) (internal citations omitted). To determine whether the MMA is applicable, we look to the substance of a claim. *Id.* Regardless of "what label a plaintiff uses, claims that boil down to a 'question of whether a given course of treatment was medically proper and within the appropriate standard' are the 'quintessence of a malpractice case.'" *Id.* (quoting *Van Sice v. Sentany*, 595 N.E.2d 264, 267 (Ind. Ct. App. 1992)).

To be outside the MMA, "a health care provider's actions must be demonstrably unrelated to the promotion of the plaintiff's health or an exercise of the provider's professional expertise, skill, or judgment." *Id.* at 186. "[T]he test is whether the claim is based on the provider's behavior or practices while acting in his professional capacity as a provider of medical services.'" *Robertson*, 63 N.E.3d at 358 (quoting *Madison Ctr., Inc. v. R.R.K.*, 853 N.E.2d 1286, 1288 (Ind. Ct. App. 2006), *trans. denied*). We have also noted that:

> A case sounds in ordinary negligence [rather than medical negligence] where the factual issues are capable of resolution by a jury without application of the standard of care prevalent in the local medical community. By contrast, a claim falls under the [MMA] where there is a causal connection between the conduct complained of and the nature of the patient-health care provider relationship.

*Id.* (quoting *Terry v. Cmty. Health Network, Inc.,* 17 N.E.3d 389, 393 (Ind. Ct. App. 2014)) (internal citations omitted).

In support of her argument that the MMA does not apply, Metz relies on *Preferred Prof. Insurance Co. v. West*, 23 N.E.3d 716 (Ind. Ct. App. 2014), *trans. denied*. In *West*, the plaintiff sustained a workplace injury due to the actions of her coworker, who was taking narcotic pain medications. The plaintiff brought a claim against her coworker's medical providers, and the trial court determined that the MMA did not apply to the plaintiff's claims. On appeal, the plaintiff claimed that the medical provider's office failed to place a telephone message slip in his medical file and that her coworker's nurse did not provide him with

the proper warnings and precautions regarding taking narcotic pain medications.

[17]     Regarding the message slip, we concluded:

> [T]he essence of the claimed misconduct does not involve any exercise of professional medical judgment or skill by the medical provider.  We have recognized that the text of the MMA indicates that the legislature intended to exclude from the MMA "conduct of a provider unrelated to the provider's exercise of judgment or skill." [*B.R. ex rel. Todd v. State*, 1 N.E.3d 708, 716 (Ind. Ct. App. 2013) (quoting *Collins v. Thakkar*, 552 N.E.2d 507, 510-11 (Ind. Ct. App. 1990), *trans. denied*), *trans. denied*.]  Indeed, there is no need for a medical review panel, the purpose of which "is to provide an expert determination on the question of whether a provider complied with the appropriate standard of care." *Id.* The issues surrounding the administrative matter of the filing of the message slip are within the understanding of the average lay juror.  A jury would be capable of resolving factual issues without applying the standard of care prevalent in the local medical community, and jurors' common knowledge and experience would enable them to understand these circumstances. Accordingly, the trial court properly determined this claim was not within the scope of the MMA.

*West*, 23 N.E.3d at 728.

[18]     Regarding the nurse's failure to provide proper warnings to the coworker, we concluded:

> The Wests' other claimed basis of negligence is that Nurse P allegedly failed to provide the proper warnings and instructions to Michael—because she was not trained properly on what to say, she negligently failed to follow procedure, or for some other

reason. In contrast to the administrative task of filing the message slip, which we found did not fall within the purview of the MMA, we find that the allegations that Nurse P failed to warn Michael present a set of facts that allege negligence "at the periphery of medical malpractice." [*Eads v. Cmty. Hosp.*, 932 N.E.2d 1239, 1244 (Ind. 2010)]. It is one of those "grey areas on the fringe of the MMA[.]" *Id.* On one hand, there appears to be no allegation that a diagnosis was in error, that the prescribed medication was inappropriate for Michael's symptoms or condition, or that Dr. H did not prescribe the correct dosage. However, the claim that Nurse P failed to warn Michael at least potentially calls into question the degree of skill exercised by Michael's health care provider. As support for their position that the MMA does not apply to their claims, the Wests characterize Nurse P as a "non-medical employee," because she was a certified athletic trainer and not a licensed nurse, and that her alleged failure to communicate warnings to Michael was "clerical." *Appellees' Wests' Br.* at 8. However, Nurse P was Dr. M's assistant, was an employee of the medical provider, was considered the acting nurse, and was responsible for communicating with patients and physicians, including regarding medications. Therefore, under the facts of this case, we do not find the athletic trainer versus licensed nurse distinction to be legally dispositive. Assuming without deciding that the claimed failure to warn Michael about the effects and restrictions of the medication constitutes giving (or failing to give) medical care as considered by the MMA, our inquiry does not end there.

*Id.* at 728-29.

[19] We then went on to conclude that, regardless, the plaintiff was not a "patient" under the MMA, and the MMA was not "intended to cover claims by third parties having absolutely no relationship to the doctor or medical provider." *Id.*

at 730. We, consequently, concluded that the plaintiff's claims constituted common law negligence, not medical malpractice.

[20] Unlike in *West*, there is no argument that Kiara was not a patient covered by the MMA. Rather, Metz seeks to characterize Medical Providers' inaction regarding Kiara's lab results as a "purely administrative act" or clerical error similar to the message slip in *West*. Appellants' Br. p. 15. According to Metz, no expert determination was required to analyze whether Medical Providers complied with an appropriate standard of care, and a lay person is capable of resolving the issues based upon his or her own common knowledge and experience.

[21] We do not find *West* persuasive here. As we have noted, the MMA defines health care as "an act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." Ind. Code § 34-18-2-13. The prompt analysis of laboratory results and proper follow up care is "part of what patients expect from health care providers." *Gordon*, 952 N.E.2d at 186. Such care is essential to the promotion of the patient's health. We disagree with Metz that the proper follow-up and interpretation of the "borderline abnormal" TSH result on Kiara's laboratory report is a matter

in the common knowledge of a lay person.[1]  This allegation is much more than a mere administrative error.

[22]  Metz also claims that Dr. Schumacher's staff member gave her the wrong test results when Metz called Dr. Schumacher's office.  Metz argues that this "negligent misrepresentation" claim does not fall within the MMA.[2]  Appellants' Br. p. 22.  Our supreme court, however, has directed that we look to the substance of the claim, not the plaintiff's label for the claim.  *See Gordon*, 952 N.E.2d at 185.  The substance of the claim is that Dr. Schumacher's staff allegedly gave Metz erroneous information regarding Kiara's laboratory test results.   Again, this allegation pertains to an act performed by a health care provider for a patient during the patient's medical care.  Providing accurate test results to a patient is also essential to the promotion of the patient's health.  As such, it falls within the purview of the MMA.

---

[1] In support of her argument, Metz relies on *Bader v. Johnson*, 732 N.E.2d 1212 (Ind. 2000), for the proposition that expert medical testimony is not required to prove that a health care worker should provide test results to a patient.  *Bader*, however, was a medical malpractice action in which the health care providers failed to provide test results to the patient.  Our supreme court noted that "expert medical testimony is usually required to determine whether a physician's conduct fell below the applicable standard of care." *Bader*, 732 N.E.2d at 1217.  The court then held that, because the failure to provide test results is not a technical complex matter, expert medical testimony was probably not required to determine whether the health care providers breached their duty.  *Id.* at 1218.  *Bader* was decided in the context of determining breach of duty under the MMA, not whether the MMA applied at all.  We do not find *Bader* persuasive here.

[2] In support of her argument, Metz relies on *H.D. v. BHC Meadows Hospital, Inc.*, 884 N.E.2d 849, 854-55 (Ind. Ct. App. 2008), *trans. denied*, in which this court held that a hospital's "negligent or reckless dissemination of a patient's confidential information to members of the general public" did not come within the purview of the MMA.  The facts of *H.D.* are not comparable to the situation here, and *H.D.* is not applicable.

[23] Although we sympathize with Metz's situation, "[i]t is difficult to contemplate that [these services] fall[] outside the [MMA]." *Id.* Under the circumstances here, we conclude that the MMA applies to Metz's claim. Because Metz failed to present the claim to a medical review panel and failed to file the claim in a timely manner, the trial court properly dismissed Metz's complaint against Medical Providers.

# Conclusion

[24] The trial court properly dismissed Metz's complaint against Medical Providers pursuant to Trial Rule 12(B)(1) and Trial Rule 12(B)(6). We affirm.

[25] Affirmed.

Brown, J., and Altice, J., concur.