

FILED

Jun 02 2023, 8:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

A. Richard M. Blaiklock
Wade D. Fulford
Michael D. Heavilon
Lewis Wagner, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
JANE DOE, JOHN DOE I, AND
JOHN DOE II

Gabriel A. Hawkins
Gregory L. Laker
Cohen & Malad, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
BOARD OF TRUSTEES OF
ANONYMOUS HOSPITAL

Brian L. Park
Norris Cunningham
Michael J. Blinn
Stoll Keenon Ogden PLLC
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
JONATHAN CAVINS[1]

Michael D. Conner
Spitzer Herriman Stephenson Holderead
Conner & Persinger, LLP
Marion, Indiana

---

[1] Although Appellee Jonathan Cavins has not participated in this appeal, he is nevertheless a party on appeal. *See* Ind. Appellate Rule 17(A) (stating that a party of record in the trial court shall be a party on appeal).

# COURT OF APPEALS OF INDIANA

Indiana Department of Insurance and Indiana Patient's Compensation Fund,

*Appellants-Defendants,*

v.

Jane Doe and John Doe I, individually and as next friends and legal guardians of John Doe II, an unmarried minor,

*Appellees-Plaintiffs,*

and

Jonathan Cavins and Board of Trustees of Anonymous Hospital,

*Appellees-Intervenors.*

June 2, 2023

Court of Appeals Case No.
22A-CT-1276

Appeal from the
Boone Circuit Court

The Honorable
Lori N. Schein, Judge

Trial Court Case No.
06C01-2108-CT-1016

**Opinion by Senior Judge Najam**
Judge Foley concurs.
Judge Robb concurs in part and dissents in part with separate opinion.

**Najam, Senior Judge.**

# Statement of the Case

Appellants, the Indiana Department of Insurance and the Patient's Compensation Fund, bring this interlocutory appeal from the trial court's denial of their motion for summary judgment on a claim for excess damages under the Medical Malpractice Act ("the Act") brought by Jane Doe and John Doe I, individually and as next friends and legal guardians of John Doe II, an unmarried minor (the "Does"). We conclude that there are no genuine issues of material fact and that the Fund is entitled to judgment as a matter of law. Accordingly, we reverse and remand with instructions.

# Issues

The ultimate question presented is whether the Does have satisfied the statutory prerequisites for access to the Patient's Compensation Fund. In order to answer that question, we must address the following issues:

I. Whether a freestanding claim of negligent credentialing can exist where the underlying act of negligence does not constitute medical malpractice under the Act;

II. Whether the liability of the health care provider as admitted and established under Indiana Code section 34-18-15-3(5) precludes the Fund from disputing the compensability of a claim for excess damages;

III. Whether the doctrines of laches and equitable estoppel can prevent the Fund from contesting compensability of an excess damages claim where the Fund did not intervene before the claimant and the health care provider reached a settlement agreement to which the Fund is not a party; and

IV. Whether this Court's opinion in *Martinez v. Oaklawn Psychiatric Center, Inc.*, 128 N.E.3d 549 (Ind. Ct. App. 2019), *clarified on reh'g*, *trans. denied*, affects the application of the Act in this case.

First, we hold that an underlying act of medical malpractice is a necessary predicate and condition precedent to a medical credentialing malpractice claim.

Second, we hold that, where the Fund is not a party to a settlement agreement between the claimant and the provider and the court must consider the liability of the health care provider as "admitted and established," the Fund is not precluded from making an independent determination and may dispute whether the underlying conduct is compensable under the Act.

Third, we hold that the Fund does not have an affirmative duty to intervene in settlement negotiations between a claimant and a provider or to address a claim for excess damages until the claim has been filed in court. Before such a claim is filed, the doctrines of laches and estoppel, on these facts, are unavailable to prevent the Fund from disputing the compensability of an excess damage claim under the Act.

And fourth, we conclude that *Martinez v. Oaklawn Psychiatric Center, Inc.* does not affect the resolution of the Does' claims.

## Facts and Procedural History

[7] Jonathan Cavins was a pediatrician who was convicted of two counts of felony child molesting, one count of felony sexual misconduct with a minor, and two counts of felony child seduction for his commission of sexual acts on several male teenage patients, including John Doe II, while he was employed at Anonymous Hospital. Following Cavins' convictions, the Does filed a medical malpractice action against Cavins and the Hospital. The Does reached a confidential settlement with the Hospital in an amount sufficient to permit them to petition for excess damages from the Patient's Compensation Fund. The settlement, however, is not final but is contingent upon whether the Does obtain access to the Fund.

[8] The Does then filed this action for additional compensation from the Fund, and both the Hospital and Cavins intervened. The Department of Insurance and the Fund moved for summary judgment, asserting that the Does' claims fall outside the scope of the Medical Malpractice Act. The trial court denied the motion, and the Department of Insurance and the Fund now appeal.[2]

---

[2] We held oral argument in this case on February 8, 2023.

# Discussion and Decision

## Standard of Review

Summary judgment is proper if the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Pike Twp. Educ. Found., Inc. v. Rubenstein*, 831 N.E.2d 1239, 1241 (Ind. Ct. App. 2005). Where, as here, the relevant facts are not in dispute, we are presented with a pure question of law for which summary judgment disposition is particularly appropriate. *Pike Twp. Educ. Found.*, 831 N.E.2d at 1241. We review pure questions of law de novo. *Id.*

Indiana's Medical Malpractice Act was enacted in 1975 and dictates the statutory procedures for medical malpractice actions. *See* Ind. Code §§ 34-18-1-1 to 34-18-18-2. The Act defines "malpractice" as "a tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." Ind. Code § 34-18-2-18 (1998). "Health care" is "an act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." Ind. Code § 34-18-2-13 (1998).

Whether a claim is one of medical malpractice as defined by the Act is a question of law to be determined by the court. *G.F. v. St. Catherine Hosp., Inc.*, 124 N.E.3d 76, 85 (Ind. Ct. App. 2019), *trans. denied*. To make that determination, we look to the substance of a claim. *Metz as Next Friend of Metz v.*

*Saint Joseph Reg'l Med. Ctr.-Plymouth Campus, Inc.*, 115 N.E.3d 489, 495 (Ind. Ct. App. 2018). The appropriate analysis involves two steps: (1) a determination of whether the alleged negligence involves provision of medical services and (2) whether the rendering of medical services was to the plaintiff for the plaintiff's benefit. *Doe v. Ind. Dep't of Ins.*, 194 N.E.3d 1197, 1201 (Ind. Ct. App. 2022), *trans. denied*.

[12] The touchstone of a claim of medical malpractice is the "'curative or salutary conduct of a health care provider acting within his or her professional capacity.'" *Metz*, 115 N.E.3d at 495 (quoting *Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182, 185 (Ind. 2011)). Claims that come within the purview of the Act must be based on "'the provider's behavior or practices while acting in his professional capacity as a provider of medical services.'" *Metz*, 115 N.E.3d at 495 (quoting *Robertson v. Anonymous Clinic*, 63 N.E.3d 349, 358 (Ind. Ct. App. 2016), *trans. denied*).

[13] On the other hand, excluded from the Act is conduct "'unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment.'" *Metz*, 115 N.E.3d at 495 (quoting *Howard Reg'l Health Sys.*, 952 N.E.2d at 185). Actions of health care providers falling outside the scope of the Act are those that are "'demonstrably unrelated to the promotion of the plaintiff's health or an exercise of the provider's professional expertise, skill, or judgment.'" *Id.* (quoting *Howard Reg'l Health Sys.*, 952 N.E.2d at 186). The Act is neither all-inclusive for claims against health care providers, nor is it intended to be extended to cases of ordinary negligence.

*G.F.*, 124 N.E.3d at 84.  It was designed to curtail, not expand, liability for medical malpractice.  *Id.*

## I. Freestanding Claim of Negligent Credentialing

In this appeal, neither the Does nor the Hospital contend that the negligent credentialing claim turns on whether a sexual assault constitutes medical malpractice.[3]  And the Fund argues that the Does' negligent credentialing claim against the Hospital is based on a claim that is not compensable under the Act.  The Fund discusses our decisions in both *Winona Memorial Hospital, Ltd. Partnership v. Kuester*, 737 N.E.2d 824 (Ind. Ct. App. 2000) and *Fairbanks Hospital v. Harrold*, 895 N.E.2d 732 (Ind. Ct. App. 2008), *trans. denied*, and concludes that, without an underlying claim of medical malpractice, a claim of negligent credentialing cannot be brought under the Act.  More particularly, a claim of negligent credentialing cannot proceed under the Act based on just *any* act of negligence; rather, the underlying negligence must constitute medical malpractice.

---

[3] At oral argument, the Fund asserted that "We all seem to agree that what [Cavins] did was not [medical malpractice]" and that "We all agree that what he did was not patient treatment."  *See* https://mycourts.in.gov/arguments/default.aspx?&id=2717&view=detail&yr=2023&when=2&page=1&court=APP&search=Doe&direction=%20ASC&future=True&sort=&judge=&county=&admin=False&pageSize=20 [https://perma.cc/JJ79-CJ37] (beginning at 4:44 and 19:49).  Neither the Does nor the Hospital contested those statements.  Instead, the Does argued that when considering a negligent credentialing claim, it does not matter whether the underlying claim sounds in medical negligence, provided that the medical malpractice element of negligent credentialing is satisfied.  Likewise, the Hospital argued that even assuming for argument's sake that a sexual assault does not constitute medical malpractice, where the credentialing decision is the proximate cause of the underlying tort, there is a viable medical malpractice claim whether or not the tort sounds in medical malpractice.

[15] For their part, the Does allege that the substance of their claim against the Hospital constitutes medical malpractice because the credentialing of a doctor, which is done by medical professionals, some of whom are required to be physicians, is directly related to the provision of health care.

[16] The Hospital agrees with the Does and further contends that, because the act of medical credentialing itself is a provision of health care that comes under the Act, any underlying tort caused by negligent credentialing will suffice, regardless of whether it constitutes medical malpractice. Stated another way, regardless of the nature of the misconduct of the credentialed physician, the character and nature of the hospital's credentialing decision remains a decision that required the exercise of professional medical expertise, skill, and judgment (i.e., an act that constitutes health care under the Act), which brings the action under the Act. The Hospital claims that *Winona* "did little more than recognize that a negligent credentialing claim is a claim of secondary liability" and, for that reason, alleges that *Fairbanks* misapplied *Winona* when it relied on *Winona* to hold that both the secondary claim of negligent credentialing *and* the underlying act of negligence that gives rise to it must constitute medical malpractice. Intervenor Hospital's Br. p. 11. In addition, the Hospital distinguishes *Fairbanks* from the present case by the fact that it involved the negligent supervision of a hospital employee rather than the negligent credentialing of a doctor.

[17] In *Winona*, we held that a claim for negligent credentialing of a doctor is an action for malpractice subject to the Act and that "[t]he credentialing process

alleged must have resulted in a definable act of medical malpractice that proximately caused injury to [the plaintiff] or [the plaintiff] is without a basis to bring the suit for negligent credentialing." 737 N.E.2d at 828. And we said that "*both* alleged negligent acts" are "required to recover (i.e., both the credentialing and the malpractice)." *Id.* (emphasis added).

[18] Eight years later in *Fairbanks*, we were called upon to decide whether a claim of negligent supervision of a hospital employee fell within the Act if the underlying tort by the employee was unwanted sexual advances. We deemed *Winona* to be dispositive of the issue and stated:

> We thus learn from *Winona* that a medical malpractice action cannot become completely unmoored from the provision of what our case law has established is the very essence of health care, i.e., "conduct, curative or salutary in nature, by a health care provider acting in his or her professional capacity[.]" This is especially true where, as here, the patient is required to prove more than one layer—or multiple acts—of tortious conduct in order to prevail. It is for this reason that the court held in *Winona* that it availed the patient nothing to prove that Winona was negligent in credentialing the physician in question if the patient did not also prove that said physician's negligence in rendering health care services was a proximate cause of the patient's harm. In other words, *both allegedly tortious acts that comprised the patient's claim of malpractice must sound in medical malpractice and not merely ordinary negligence*.

*Fairbanks*, 895 N.E.2d at 738 (cleaned up) (emphasis added). We therefore concluded that both claims—sexual misconduct by Fairbanks' employee *and*

Fairbanks' negligent supervision of the employee—must sound in medical malpractice in order for the action to come within the Act's purview. *Id.*

[19] While we acknowledge the distinction between the negligent hiring, training, and supervision of a hospital employee and the negligent credentialing of a doctor, we conclude that *Fairbanks* correctly applied *Winona* and, in any event, this distinction does not affect our analysis in this case. And we cannot agree with Hospital's view that *any* tort will do, that a negligent credentialing claim is a freestanding claim, and that "it makes no difference" whether the underlying claim sounds in medical negligence. Intervenor Hospital's Br. p. 15. This is an argument that finds no support in our case law; rather, the case law is clear that an underlying act of medical malpractice is the predicate and condition precedent for a negligent credentialing claim. Indeed, relying on *Winona*, in *Martinez v. Park*, we succinctly and unambiguously stated that "Without a showing of an underlying breach of the standard of care by Dr. Park proximately causing Martinez's injuries, the Healthcare Center cannot be liable for the negligent credentialing of him." 959 N.E.2d 259, 272 (Ind. Ct. App. 2011).

[20] Just as we did in *Fairbanks*, we conclude here that "a medical malpractice action cannot become completely unmoored from the provision of what our case law has established is the very essence of health care . . . ." 895 N.E.2d at 738. Thus, we hold once again that negligent credentialing is a secondary claim of liability that requires two negligent acts: (1) an underlying act of negligent health care by a credentialed physician and (2) negligence by the hospital in

credentialing the physician. In order to state a claim that comes within the purview of the Act, and thus confer access to the Fund, both acts must constitute medical malpractice. A plaintiff cannot assert a claim of negligent credentialing to bootstrap and convert a common law negligence claim into statutory medical malpractice. In this case, the Does' claim against the Hospital is tantamount to a common law tort of negligent hiring and retention akin to the claims asserted in *Fairbanks*. Given that this Court has consistently held that sexual misconduct is unrelated to the promotion of a patient's health and does not constitute medical malpractice,[4] Cavins' misconduct here constitutes ordinary negligence, not medical malpractice, and thus the Does' secondary claim of negligent credentialing cannot come within the purview of the Act.

[21] The dissent advocates for a radical departure from Indiana caselaw, which makes clear that conduct "'demonstrably unrelated to the promotion of the [patient]'s health'" falls outside the scope of the Act. *Metz*, 115 N.E.3d at 495

---

[4] *See, e.g.*, *Doe*, 194 N.E.3d 1197 (tort claim arising from sexual assault by nurse while patient was hospitalized did not fall within purview of the Act); *Fairbanks*, 895 N.E.2d 732 (claims based on hospital employee's unwanted sexual advances toward patient did not to fall under the Act); *Grzan v. Charter Hosp. of Nw. Ind.*, 702 N.E.2d 786 (Ind. Ct. App. 1998) (mental health counselor's conduct of engaging in emotional and sexual relationship with patient did not fall within scope of the Act); *Murphy v. Mortell*, 684 N.E.2d 1185 (Ind. Ct. App. 1997) (hospital employee's act of molesting patient did not constitute rendition of health care or professional services, was not designed to promote patient's health, and did not call into question employee's use of skill or expertise as a health care provider; thus, patient's claim sounded in general negligence and did not fall within purview of the Act), *trans. denied*; *Doe by Roe v. Madison Ctr. Hosp.*, 652 N.E.2d 101 (Ind. Ct. App. 1995) (coerced sexual intercourse between minor patient and hospital employee held not to fall under the Act), *trans. dismissed*.

(quoting *Howard Reg'l Health Sys.*, 952 N.E.2d at 186). If adopted, the dissent's reasoning would vastly expand liability for statutory medical malpractice claims to include criminal acts—a result disavowed by our precedent and clearly not contemplated or intended by our legislature. *See, e.g.*, *G.F.*, 124 N.E.3d at 84. We decline to take that path.

[22] The dissent cites our holding in *Winona* that "a claim for negligent credentialing of a physician is an action for malpractice subject to the Act" but disregards our declaration in the same case that "the Act applies to conduct [that is] curative or salutary in nature." 737 N.E.2d at 828. Here, Cavins' criminal conduct is unrelated to the promotion of the patient's health and not curative or salutary in nature. A sexual assault will not support a medical malpractice claim because a sexual assault does not constitute the practice of medicine. Rather, a sexual assault is a crime that occupies a different realm than medical negligence. The fact that the crime occurs within the context of a doctor-patient relationship does not alter the essence of the crime or transform the crime into medical malpractice. In this case, the physician's misconduct cannot be characterized as "health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." See Ind. Code § 34-18-2-18 (defining "malpractice"). Thus, the sexual assault underlying the claim does not satisfy the statutory definition of medical malpractice.

## II. Effect of Indiana Code § 34-18-15-3(5)

[23] The Does additionally argue that the Fund cannot challenge their negligent credentialing claim against the Hospital because it is "established" as a matter

of law as a result of their settlement agreement. To support this argument, the Does cite Indiana Code section 34-18-15-3(5) (2017), which provides: "In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established."

[24] The Does conflate two distinct concepts: "factual compensability" and "legal compensability." In *Robertson v. B.O.*, our Supreme Court distinguished between a provider's underlying liability for negligence ("factual compensability") and compensability from the Fund ("legal compensability"). 977 N.E.2d 341, 347 (Ind. 2012). The Court explained that, under Indiana Code section 34-18-15-3(5), the question of factual compensability is foreclosed when a plaintiff settles with a health care provider. *Id.* at 347-48. However, such a settlement does not preclude the Fund from contesting the legal compensability of the claimed injury as one that is not compensable under the Act and therefore also not subject to a claim for excess damages from the Fund. *Id.*

[25] In *Cutchin v. Ind. Dep't of Ins.*, 446 F. Supp. 3d 413, 420-21 (S.D. Ind. 2020), *rev'd and remanded sub nom. on other grounds, Cutchin v. Beard*, 854 F. App'x 86 (7th Cir. 2021), we find an excellent discussion of the distinction our Supreme Court articulated in *Robertson*. Plaintiff Cutchin attempted the same argument as the Does proffer here. After reaching a settlement agreement with providers, Cutchin sought excess damages from the Fund. The Fund argued the Act did not apply to Cutchin's claim. Citing the same statutory language as the Does,

Cutchin argued the Fund was foreclosed from contesting the applicability of the Act and therefore the Fund's liability for excess damages. He asserted that the language of Indiana Code section 34-18-15-3(5) unequivocally establishes the Fund's liability when a health care provider settles a claim with a claimant.

[26] The court rejected Cutchin's claim and explained that his settlement with the provider established the liability of only the health care provider, not the liability of the Fund. The court pointed to the plain language of the statute that states: "the court shall consider the liability of the *health care provider* as admitted and established." Ind. Code § 34-18-15-3(5) (emphasis added). The court thus distinguished between a challenge to the liability of a health care provider, which the Fund cannot do after settlement between the plaintiff and the provider, and a challenge to the applicability of the Act, which the Fund may do even when a settlement has occurred. Accordingly, the court in *Cutchin* concluded that the settlement between Cutchin and the providers did not foreclose the Fund from challenging the applicability of the Act and did not establish the Fund's liability. Considering the Does' argument on this issue, we agree with and adopt the reasoning set forth in *Cutchin*. We therefore conclude that the settlement agreement between the Does, the Hospital, and Cavins established only the liability of Cavins and the Hospital (per *Robertson*, the "factual compensability") and does not preclude the Fund from challenging the applicability of the Act (per *Robertson*, the "legal compensability") to the claims of the Does.

## III. Laches and Estoppel

[27] The Hospital contends the equitable doctrines of laches and estoppel should be applied to preclude the Fund from challenging the applicability of the Act to the Does' claim. Particularly, the Hospital alleges the Fund should have contested the Does' claim to excess damages sooner than it did. We cannot agree.

[28] The parties to a medical malpractice claim cannot bind the Fund, a non-party, by an adjudication or stipulation establishing the health care provider's factual liability in negligence. As we discussed in Issue II, a settlement establishing a provider's factual liability does not necessarily establish whether the claim is covered under the Act or the Fund's liability for excess damages. Rather, the Fund is permitted to make an independent determination of whether a claim for excess damages is based upon a claim covered by the Act, and the Fund's responsibility in this regard is not ripe until a claim for excess damages is made. *See* Ind. Code § 34-18-15-3(1) (if plaintiff demands damages in excess of provider's policy limits, plaintiff must file petition in court demanding payment from the Fund); -3(2) (petition must contain sufficient information to inform parties about nature of claim and amount demanded, and plaintiff must serve petition on commissioner (administrator of Fund)); -3(3) (commissioner may object to demand); -3(5) (at hearing on petition and objections, court shall hear evidence to determine amount, if any, to be paid from the Fund). Until such time as a petition demanding payment of damages from the Fund is filed under Subsection 34-18-15-3(1), the Fund is not required to participate in settlement of the plaintiff's claim or to intervene in the plaintiff's action. Accordingly, the

Fund cannot be faulted for not having indicated or made an excess damages determination before the plaintiff's petition for excess damages has been filed and triggers the Fund's statutory responsibility to weigh in. It is the plaintiff's burden to show he or she has met the statutory prerequisites under Section 34-18-15-3 in order to petition the Fund for excess damages. *McCarty v. Walsko*, 857 N.E.2d 439, 443 (Ind. Ct. App. 2006).

[29] Although the Hospital raises the defense of laches, it fails to address any of the elements that would establish that defense. The Hospital also fails to establish its equitable estoppel claim. The Hospital contends that the parties were harmed by the Fund's "after-the-fact challenge to settlement," that the Fund had been on notice of the claim for years, and that the settlement agreement was reached in "detrimental reliance" on the Fund's silence, where the Fund had the "opportunity to intervene and elected not to." Intervenor Hospital's Br. p. 16. The reliance element of estoppel has two parts: (1) reliance in fact and (2) right to rely. *Wabash Grain, Inc. v. Smith*, 700 N.E.2d 234, 237 (Ind. Ct. App. 1998), *trans. denied*. The parties' settlement agreement is expressly conditioned upon whether the Fund "successfully rejects" the agreement and the Does' petition for excess damages, in which event the agreement "shall be null and void." *See* Appellants' App. Vol. IV, p. 48, ¶ 16.1. Having anticipated that the Fund could well dispute an excess damages claim, the parties cannot now be heard to complain that they relied in fact on the Fund's silence and were blindsided when the Fund did just that. And, as we have said, because the Fund had no duty to intervene in the parties' settlement negotiations, the

parties had no right to rely on the Fund's alleged failure to participate in those negotiations.

[30] We conclude, therefore, that the doctrines of laches and estoppel do not apply on these facts. And where the Fund is not a party to a settlement agreement between the claimant and the provider, the Fund has no affirmative duty to address a claim for excess damages until a claimant has filed a petition in court demanding payment of damages from the Fund.

## IV. Application of *Martinez v. Oaklawn Psychiatric Center*

[31] As we have seen, the ultimate question presented here is whether the Does are entitled to claim excess damages from the Fund based upon their negligent credentialing claim against the Hospital. In considering that question, the parties have addressed whether this Court's opinion in *Martinez v. Oaklawn Psychiatric Center* affects application of the Act in this case.

[32] *Martinez* announced a new "current test" for evaluating medical malpractice claims based upon the employment law concept of scope of employment and the doctrine of respondeat superior. 128 N.E.3d at 558. Specifically, *Martinez* stated that the test for whether the Act applies to specific misconduct is "whether that misconduct arises naturally or predictably from the relationship between the health care provider and patient or from an opportunity provided by that relationship." *Id.* However, as discussed below, we did not apply that test in *Martinez*, and the holding in *Martinez* did not deviate from established

case law on the scope of the Act. *See Doe*, 194 N.E.3d at 1204 (stating that "the *Martinez* court essentially applied the accepted and longstanding standard").

[33] Instead, *Martinez* reiterated and applied the well-established standard for conduct covered by the Act, namely, that "The Act covers 'curative or salutary conduct of a health care provider acting within his or her professional capacity, but not conduct unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment.'" *Id.* at 556 (quoting *Terry v. Cmty. Health Network, Inc.*, 17 N.E.3d 389, 393 (Ind. Ct. App. 2014)). We also recognized the long-standing rule that "When deciding whether a claim falls under the provisions of the Medical Malpractice Act, we are guided by the substance of a claim to determine the applicability of the Act." *Martinez*, 128 N.E.3d at 556. And we confirmed that in determining whether a claim sounds in medical malpractice, "we consider whether the claim is based on the provider's behavior or practices while acting in his professional capacity as a provider of medical services." *Id.*

[34] In *Martinez*, the employee's scope of employment and the employer's vicarious liability were not at issue. *Doe*, 194 N.E.3d at 1203 n.5. We noted that "[t]he parties agree that [the employee] was an employee of Oaklawn, a 'health care provider,' and when the incident occurred, [the employee] was acting within the scope of his employment." *Martinez*, 128 N.E.3d at 556. And we concluded, "The undisputed record establishes that Oaklawn is a healthcare provider and [the employee] is, and was at the time of the incident at issue in this case, its employee." *Id.* at 562. Thus, the holding in *Martinez* did not turn

on whether or not the residential assistant was employed by Oaklawn, and it was also undisputed that the assistant's conduct "was a part of Oaklawn's provision of healthcare to Martinez." *Id.*

[35] Here, just as in *Martinez*, scope of employment and vicarious liability are not at issue. We acknowledge, of course, that in a given case, a health care provider's scope of employment may be relevant and potentially dispositive in making an employer liability determination under the Act, but this is not the case.

[36] In sum, in *Martinez* we did not apply the "current test." *Doe*, 194 N.E.3d at 1204. Rather we concluded both that Oaklawn's employee was acting within the scope of his employment with Oaklawn, a health care provider, and that the employee's "attempt to enforce Martinez's curfew was a part of Oaklawn's provision of healthcare to Martinez." *Martinez*, 128 N.E.3d at 562. In other words, we held that the alleged medical malpractice fell squarely within the well-established purview of the Act. While we stated that we would "apply [the current] test to the facts and circumstances of this case" and alluded to "the broadened scope of employment set forth in" *Cox v. Evansville Police Dep't*, 107 N.E.3d 453 (Ind. 2018), we did not apply the "current test" to any conduct not already within the recognized scope of the Act. *Martinez*, 128 N.E.3d at 558, 562. A close reading of *Martinez* shows that the test was not a factor and was not dispositive. Instead, in *Martinez* we followed—and did not broaden or otherwise deviate from—well-established medical malpractice case law. Thus, we conclude that the actual holding in *Martinez* does not affect the application of the Act in this case.

## Conclusion

[37] Based upon the foregoing, we hold that an underlying act of medical malpractice which is a proximate cause of the patient's harm is a necessary predicate and condition precedent to a medical credentialing malpractice claim. We also hold that, where the Fund is not a party to a settlement agreement between the claimant and the provider and the court must consider the liability of the health care provider as "admitted and established," the Fund is not precluded from making an independent determination and disputing whether the underlying conduct is compensable under the Act. Finally, we conclude that the Fund has no affirmative duty to intervene in settlement negotiations between the claimant and the provider or to address a claim for excess damages until a claimant has filed a petition in court for payment of damages from the Fund. Accordingly, we find there are no genuine issues of material fact, and the Fund is entitled to judgment as a matter of law.

[38] Reversed and remanded with instructions for the trial court to enter summary judgment in favor of the Fund.

Foley, J., concurs.

Robb, J., concurs in part and dissents in part with separate opinion.

**Robb, J., concurring in part and dissenting in part.**

[39]　I concur in Parts II, III, and IV of the majority opinion. As to Part I, I respectfully dissent. The Fund has asked this court to decide, first, if this act of sexual abuse of a minor by a doctor that occurred during an appointment with the victim patient sounds in medical malpractice and, second, whether a claim of negligent credentialing can only occur when the underlying misconduct is one of medical malpractice. The Fund takes the position that the Does' claim for excess damages from the Fund cannot stand absent a claim of medical malpractice. According to the Fund, Cavins' sexual abuse of his minor patient did not amount to medical malpractice and negligent credentialing is not a standalone claim.

[40]　The majority mischaracterizes the dissent's position in issue one in calling it a "radical" departure from Indiana caselaw. --- N.E.2d ---, --- (Ind. Ct. App. 2023). As explained and demonstrated in detail below, the dissent's position is consistent with other state jurisdictions that have answered the question before us.

[41]　As to the second issue, I disagree with the majority's conclusion that the commission of patient sexual abuse by a health care provider during treatment of the patient precludes a medical malpractice claim. First, as stated above, we believe the caselaw supports the conclusion that this molest sounds in medical malpractice and provides the condition precedent that even the majority seeks.

[42] Second, the majority concedes that negligent credentialing does not require an underlying act of medical malpractice misconduct which is consistent with the law. And, a claim for negligent credentialing is an action for malpractice subject to the Act.[5] *Winona Mem'l Hosp., Ltd. P'ship v. Kuester*, 737 N.E.2d 824, 828 (Ind. Ct. App. 2000). Since a negligent-credentialing claim, in and of itself, falls within the Act, even if the molest in the instant case is not found to fall within the Act, the negligent credentialing is supported by a sufficient act of misconduct and the medical malpractice nature of the negligent-credentialing claim supports the Appellees' right to obligate the Fund.

[43] To prevail, the Fund has to win under both issues. If the Fund loses under either, the Fund cannot prevail. However, under the facts and circumstances of this case, the Fund loses under both issues because (1) the sexual abuse Cavins perpetrated on his young victim was medical malpractice that falls under the Act; and (2) as all parties agree, a negligent-credentialing claim is a medical malpractice question, but it is not necessary to have an underlying *medical malpractice claim per se* to support a claim for negligent credentialing – a nonmedical malpractice bad act can support a negligent-credentialing claim. Thus, the Fund's potential obligation to pay excess damages to the Does is supported by both issues. And, the trial court's determination that the Fund's

---

[5] *See* ¶¶ 18-22, *infra*, for a discussion of the distinction between the terms "credentialing" and "privileging."

summary judgment motion on a claim for excess damages should be denied is supported by the law.

[44]  Because this is a case of first impression, it presents a unique circumstance where we are tasked with addressing a negligent-credentialing claim where a pediatrician administering a physical examination to a minor – that included discussion and instruction on the use of condoms – sexually abused the patient by stroking and then placing a condom on the patient's penis. Prior Indiana cases have, in the medical malpractice context, addressed situations where a patient was sexually abused by a medical professional while healthcare or medical treatment was administered to the patient. However, none of those cases quite replicates the facts as presented in the instant case.

[45]  In reaching its determination – that the Does' negligent-credentialing claim against the Hospital fails for lack of an underlying act of medical malpractice as a necessary predicate and condition precedent – the majority begins and ends its analysis with whether Cavins' misconduct constitutes medical malpractice. And the majority concludes that, based on legal precedent, Cavins' misconduct does not. Therefore, the majority has determined, the negligent-credentialing claim fails because there is no underlying medical malpractice on the part of the doctor; there are no genuine issues of material fact; the Fund is entitled to judgment as a matter of law; and, thus, summary judgment should be entered in favor of the Fund. However, with this holding, the majority has essentially foreclosed negligent-credentialing claims in every circumstance where sexual abuse occurs during medical treatment.

[46]    I begin with the determination that first and foremost, the sexual abuse that Cavins perpetrated on his young patient during the physical examination *did* constitute medical malpractice. Second, even if the bad act did not rise to the level of medical malpractice, the alleged negligent-credentialing claim, nevertheless, survives – not as a free-standing claim but based on misconduct on the part of the health care provider that results in underlying liability. Thus, it is possible that nonmedical misconduct may trigger an inquiry on the part of the patient into the credentialing process – in this case, an inquiry into whether the Hospital should have extended privileges to Cavins. And because the sexual abuse in question falls under the Act, under either issue, *supra*, the Does' negligent-credentialing claim stands.

[47]    If we approach such claims as the majority instructs, then we risk running afoul of the purpose of the Act – that is, to facilitate the adjudication and settlement of alleged medical malpractice claims. And we open the door to the risk that health care providers will wrongly prevail on summary judgment; viable claims of negligent credentialing will be lost; and the real issue presented will never be reached.

[48]    Additionally, I note that in this case, the confidential settlement reached between the Does and the Hospital necessarily eclipsed a summary judgment factfinding inquiry that could have uncovered any facts that might support

finding that Cavins did in fact commit medical malpractice.[6] However, even under these circumstances, the majority posits that, in cases such as this, where sexual abuse occurs during medical treatment, there is *no* set of material facts that can bring the Does' claims under the Act. The majority has cast its net too wide because:

1.  The majority assumes, even under circumstances where the development of potential material facts has not occurred, that an act of sexual abuse of a patient during medical treatment can *never* amount to medical malpractice – a notion which is foundationally unsound because it pronounces, ipso facto, that there can never be medical malpractice under circumstances where a health care provider commits sexual abuse while providing medical treatment.

2.  The majority has made a determination, as a matter of law, that henceforth there can be no set of circumstances where a health care provider who, during medical treatment, sexually abuses a patient commits medical malpractice, and, the majority, essentially, precludes in Indiana any such claim from rising to the level of medical malpractice.

---

[6] The Does and the Hospital are, essentially, aligned on appeal. As the majority notes, the Does reached a confidential settlement with the Hospital in an amount sufficient to permit the Does to petition for excess damages from the Fund. However, the settlement is not final, as it is contingent upon whether the Does obtain access to the Fund.

Furthermore, according to the majority, a negligent-credentialing claim does not require the underlying misconduct to constitute medical malpractice. But even absent the majority's concession, the appropriate conclusion in this case is that the trial court properly denied the Fund's summary judgment motion, and the law supports this.

In sum, and as further explained below, the majority's holding is a bridge too far and produces unintended and far-reaching consequences that not only undermine the purpose and intent of the Act but also foreclose the possibility that in certain circumstances sexual abuse that occurs during medical treatment can rise to the level of medical malpractice.

### *Purpose of the Act*

Since its enactment in 1975, the Act has dictated the statutory procedures for medical malpractice actions. *See* Ind. Code § 34-18-1-1 *et seq.* "One of the principal legislative purposes behind the [Act] . . . was to foster prompt litigation of medical malpractice claims." *Ellenwine v. Fairley*, 846 N.E.2d 657, 664 (Ind. 2006). As we reasoned in *Sue Yee Lee v. Lafayette Home Hosp., Inc.*, "Viewed from the historical perspective[,] the conclusion is inescapable that our General Assembly intended that all actions the underlying basis for which is alleged medical malpractice are subject to the [A]ct." 410 N.E.2d 1319, 1324 (Ind. Ct. App. 1980). It is well-settled that a claim for negligent credentialing of a physician is an action for malpractice subject to the Act. *Winona*, 737 N.E.2d at 828. And with any complaint alleging medical malpractice, the plaintiff's action begins under the premise that the health care

provider's misconduct falls within the Act until a medical review panel or a court determines otherwise.[7]

[52] However, as a prerequisite to filing suit in court, the Act generally requires claimants to file a proposed complaint with a medical review panel. Ind. Code § 34-18-8-4. The complaint is then reviewed by the panel, which provides an expert opinion about whether the claim involves malpractice, thus ensuring that in cases where a party seeks recovery from the Fund, it is only those cases that appropriately fall within the confines and further the purpose of the Act that remain viable.[8] Ind. Code § 34-18-10-22. The Act limits recovery against

---

[7] The elements of a medical malpractice claim are: (1) the medical provider owed a duty to the plaintiff; (2) the medical provider failed to conform his or her conduct to the requisite standard of care; and (3) an injury to the plaintiff resulted from that failure. *Glon v. Mem'l Hosp. of S. Bend, Inc.*, 111 N.E.3d 232, 239 (Ind. Ct. App. 2018), *trans. denied*. The plaintiff must present expert medical testimony establishing: (1) the applicable standard of care required by Indiana law; (2) how the defendant medical provider breached that standard of care; and (3) that the medical provider's negligence in doing so was the proximate cause of the injuries complained of. *Id.*

[8] Although limited exceptions apply, generally speaking, an action against a health care provider may not be commenced in an Indiana court before (1) the complaint has been presented to a medical review panel and (2) an opinion is given by the panel. Ind. Code § 34-18-8-4. "'When a medical review panel renders an opinion in favor of the physician, the plaintiff must come forward with expert medical testimony to rebut the panel's opinion . . . .'" *Overshiner v. Hendricks Reg'l Health*, 119 N.E.3d 1124, 1132 (Ind. Ct. App. 2019) (quoting *Robertson v. Bond*, 779 N.E.2d 1245, 1249 (Ind. Ct. App. 2002), *trans. denied*), *trans denied*. "Because of the complex nature of medical diagnosis and treatment, expert testimony is generally required to establish the applicable standard of care." *Desai v. Croy*, 805 N.E.2d 844, 850 (Ind. Ct. App. 2004) (citing *Simms v. Schweikher*, 651 N.E.2d 348, 349-50 (Ind. Ct. App. 1995)), *trans denied.* "If medical expert opinion is not in conflict regarding whether the physician's conduct met the requisite standard of care, there are no genuine triable issues." *Id.*

In limited instances, however, expert opinion evidence may not be required because the doctrine of res ipsa loquitur applies. This doctrine recognizes that the circumstances surrounding an injury may be such as to raise a presumption, or at least permit an inference, of negligence on the part of the defendant, despite the medical review panel's opinion to the contrary. *St. Mary's Ohio Valley Heart Care, LLC v. Smith*, 112 N.E.3d 1144, 1150 (Ind. Ct. App. 2018), *trans. denied*.

covered medical providers and allows any excess damages to be paid out of the Fund. Ind. Code § 34-18-14-3.

### *Duty Hospital Owes to Patients*

[53]　Hospitals owe their patients a duty to exercise reasonable care in rendering hospital services, which includes a duty to safeguard the welfare of its patients from harm inflicted by third persons. *See generally* 41 C.J.S. *Hospitals* § 35. The essence of the general duty of care owed to patients by a hospital is to provide patients with an environment where their health and safety needs can best be addressed. *Id.* A broad general duty of care can include numerous specific activities, such as compliance with applicable hospital administration standards, the existence of an adequate quality assurance program, and the proper training and supervision of hospital staff. *Id.*

[54]　Regarding the tort of negligent credentialing, "[a] hospital always has a duty to exercise reasonable care in granting privileges to physicians." *Rieder v. Segal*, 959 N.W.2d 423, 429 (Iowa 2021). As noted in *Brookins v. Mote*, where the Montana Supreme Court recognized negligent credentialing as a valid cause of action in Montana,

> [T]he rise of the "modern hospital" imposed a duty on hospitals to take steps to ensure patient safety in the process of accreditation and granting privileges:
>
>> [T]he integration of a modern hospital becomes readily apparent as the various boards, reviewing committees, and designation of privileges are found to rest on a structure designed to control, supervise, and review the work within

the hospital. The standards of hospital accreditation . . . demonstrate that the medical profession and other responsible authorities regard it as both desirable and feasible that a hospital assume certain responsibilities for the care of the patient.

2012 MT 283 at ¶ 58, 367 Mont. 193, 211, 292 P.3d 347, 360 (2012) (quoting *Hull v. N. Val. Hosp.*, 159 Mont. 375, 389, 498 P.2d 136, 143 (1972)).

[55] A hospital's governing board "is the supreme authority in the hospital[,]" and that board is responsible for the management, operation, and control of the hospital; the appointment, reappointment, and assignment of privileges to members of the medical staff; and establishment of requirements for appointments to and continued service on the hospital's medical staff. Ind. Code § 16-21-2-5. Under Indiana Code section 16-21-2-7, the medical staff of a hospital is responsible to the governing board for the following:

(1) The clinical and scientific work of the hospital.

(2) Advice regarding professional matters and policies.

(3) Review of the professional practices in the hospital for the purpose of reducing morbidity and mortality and for the improvement of the care of patients in the hospital, including the following:

(A) The quality and necessity of care provided.

(B) The preventability of complications and deaths occurring in the hospital.

### *Credentialing and Extending Hospital Privileges to Physicians*

[56] Another way in which hospitals protect patients from harm is through the credentialing and privileging processes. In this case, the parties to this appeal use the terms "credentialing" and "privileging" interchangeably. However, our focus here is on privileging, not credentialing. And although the terms are closely related, they do refer to distinct concepts, but that distinction has not been used by the parties to this appeal in any of their arguments. "Credentialing" refers to the process of determining whether a doctor is qualified to be on the medical staff. *See, e.g.*, *Hall v. Jennie Edmundson Mem'l Hosp.*, 812 N.W.2d 681, 683 n.1 (Iowa 2012). "Privileging" refers to the determination by the hospital as to which specific procedures a doctor will be allowed to perform within the hospital. *Id.*

[57] More specifically, credentialing is the process in which a physician's credentials are verified; is a way to confirm that the physician graduated from medical school and received their certification; and ensures that a physician has a license to practice medicine in their specialty and in their state. Justin Nabity, *Hospital Credentialing: What to Expect as a Physician* (Nov. 4, 2022), https://physiciansthrive.com/hospital-credentialing/ [https://perma.cc/J993-S2BC] (last visited May 15, 2023). Credentialing is important because it is the healthcare industry's best way to protect patients by ensuring that patients receive high-quality care from physicians who have met state licensure and certification requirements. *Id.* Credentialing is the first step in gaining employment as a physician and is a prerequisite for obtaining privileges. *Id.*

And physicians *must* go through the process of credentialing before they can apply for hospital privileges. *Id.*

[58] Privileges, on the other hand, permit physicians to treat and perform certain procedures on patients, and without those privileges, a physician cannot treat patients in a hospital setting. *Id.* The privileging process centers on the physician's scope of practice related specifically to patient care and ensures that a physician has experience and competency in their specialty or area of medicine. *Id.*

[59] Simply put, medical credentialing allows healthcare practices to confirm the qualifications of their healthcare professionals, while privileging ensures that physicians have the experience and clinical competency necessary, within their area of medicine, to care for patients. *The Privileging Puzzle: Requirements for Providers and Organization* (Jan. 10, 2023), https://www.healthstream.com/resource/blog/the-privileging-puzzle-requirements-for-providers-and-organizations [https://perma.cc/Q5MN-44FH] (last visited May 15, 2023). And to protect patients, hospitals must adhere to complex and lengthy credentialing and privileging processes to screen physicians, verify their ability to practice, and determine which procedures and services a physician is competent to perform and deliver. Jan Laws, *Federal Regulations & Other Standards for Credentialing and Privileging* (May 17, 2021), https://www.symplr.com/blog/federal-regulations-other-standards-for-credentialing-and-privileging [https://perma.cc/S2KT-U2UB] (last visited May 15, 2023). Although details of the credentialing and privileging processes vary

depending upon the hospital, location, medical specialties, and particular circumstances involved, the processes typically involve numerous steps, such as:

> Providing and keeping updated contact information for all providers on staff;

> Providing a checklist of credentialing information required of physicians applying for privileges at a facility or practice site;

> Requiring peer references and checking those references;

> Performing background checks and verifying accuracy with listed references, former employers, federal agencies, state licensing boards, medical associations, and specialty certification boards;

> Investigating details of any malpractice claims;

> Submitting the credentialing application to the facility's governing body for final review and a decision on whether to approve the application for privileges.

*Medical Staff Credentialing, Privileges & Peer Review*, https://www.komahonylaw.com/medical-staff-credentialing-privileges-peer-review/ [https://perma.cc/A3TD-5NXY] (last visited May 15, 2023).

[60] Together, credentialing and privileging ensure patients have access to safe and reliable care. *The Privileging Puzzle: Requirements for Providers and Organization* (Jan. 10, 2023), https://www.healthstream.com/resource/blog/the-privileging-puzzle-requirements-for-providers-and-organizations

[https://perma.cc/Q5MN-44FH] (last visited May 15, 2023). Improper privileging and credentialing can lead to patient harm and lawsuits. Jan Laws, *Federal Regulations & Other Standards for Credentialing and Privileging* (May 17, 2021), https://www.symplr.com/blog/federal-regulations-other-standards-for-credentialing-and-privileging [https://perma.cc/S2KT-U2UB] (last visited May 15, 2023).

### The Parties' Arguments on Appeal

In the instant case, the Fund argues, essentially, that the act of negligently credentialing a doctor (read, negligently privileging a doctor) who then sexually assaults a minor does not transform an otherwise common-law-negligence case into one of statutory medical malpractice.[9] The Fund maintains that Cavins' misconduct did not amount to medical malpractice and negligent credentialing is not a standalone claim. So, according to the Fund, without an underlying claim of *medical malpractice*, the Does' claim of negligent credentialing cannot stand. The Fund argues that unless the underlying misconduct is within the Act, the question of privileges and credentialing has no merit.

The majority states that "neither the Does nor the Hospital contend that the negligent-credentialing claim turns on whether a sexual assault constitutes medical malpractice" and that neither party contests the Fund's statement at

---

[9] Having noted the distinction between the terms "credentialing" and "privileging," I use the term "credentialing" as the parties do to avoid any confusion regarding the parties' respective arguments.

oral argument that the parties all "seem to agree that what [Cavins] did was not [medical malpractice]." --- N.E.2d at --- n.3. I disagree with the majority's characterization of the Does' and the Hospital's arguments. The Does argue their negligent-credentialing claim survives because the substance of their claim sounds in malpractice and is inextricably linked to medical care. According to the Does: (1) it was negligence on the part of the Hospital to credential Cavins; (2) the credentialing of Cavins was the proximate cause of the injury to John Doe II; and (3) in order to determine whether red flags existed that should have alerted the Hospital's credentialing board to not credential Cavins, expert medical testimony is needed to explain Cavins' duties and obligations and the intricacies of the different medical procedures Cavins was authorized to perform at the Hospital.

[63] The Hospital argues that because it was required to engage in a credentialing process, and because the Does allege the Hospital did so negligently, then Cavins' misconduct falls within the Act – even though the same misconduct, if perpetrated by a nonmedical person, would not fall within the Act. The Hospital maintains that it does not matter what kind of misconduct occurs on the part of the doctor, so long as some sort of underlying liability exists. And when a claim against the Hospital invokes a credentialing decision, any misconduct on the doctor's part falls under the Act because the misconduct, no matter the type, does not alter a hospital's credentialing duty. In other words,

because the granting of hospital credentials is a decision made by doctors who are reviewing other doctors, that sort of decision falls squarely within the Act.[10]

### *Cavins' Misconduct Constitutes Medical Malpractice*

[64] In determining whether Cavins' misconduct – that is, his sexual abuse of John Doe II during the examination – amounted to medical malpractice, the facts and circumstances of this case lead to a positive answer. In the instant case, the record clearly establishes that, for purposes of the Act, John Doe II was a patient, and both Cavins and the Hospital were health care providers. And it is not disputed that Cavins committed a bad act. But as to the question of whether Cavins' misconduct constitutes medical malpractice, I part ways with the majority and maintain that it does. Not only was Cavins treating John Doe II at the time the sexual abuse occurred, but the sexual abuse was so inextricably intertwined and so closely connected to the examination and to why John Doe II was being treated by Cavins such that the misconduct was inseparable from the medical care that was provided during the physical examination of John Doe II. And because of this close connection between the medical care administered and the underlying misconduct, that misconduct rises to the level of medical malpractice. I explain in greater detail below.

[65] The Act, by its plain terms, applies only to "a patient or the representative of a patient who has a claim for bodily injury or death on account of malpractice."

---

[10] As we noted in footnote 2, *supra*, the Does and the Hospital are, essentially, aligned on appeal.

*Lake Imaging, LLC v. Franciscan All., Inc.*, 182 N.E.3d 203, 207 (Ind. 2022) (quoting Ind. Code § 34-18-8-1). "Malpractice" is a "tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." Ind. Code § 34-18-2-18. As explained in *B.R. ex rel. Todd v. State*,

> A "patient" is "an individual who receives or should have received health care from a health care provider, under a contract, express or implied, and includes a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider." [Ind. Code] § 34-18-2-22. And "health care" is "an act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." [Ind. Code] § 34-18-2-13.

1 N.E.3d 708, 713 (Ind. Ct. App. 2013), *trans. denied*.[11] Relevant to this case, Indiana Code section 34-18-2-14(1) defines "health care provider" as "[a]n individual, . . . a limited liability company [or a] corporation . . . licensed or legally authorized by this state to provide health care or professional services as a physician [or a ] . . . hospital[.]"

[66] However, when deciding whether a claim falls under the provisions of the Act, "we are guided by the substance of a claim to determine the applicability of the Act." *Doe by Roe v. Madison Ctr. Hosp.*, 652 N.E.2d 101, 104 (Ind. Ct. App.

---

[11] The Act does not define the term "professional services."

1995).  And the "fact that the alleged misconduct occurs in a healthcare facility" or that "the injured party was a patient at the facility" is not dispositive in determining whether the claim sounds in medical malpractice.  *Madison Ctr., Inc. v. R.R.K.,* 853 N.E.2d 1286, 1288 (Ind. Ct. App. 2006), *trans. denied*. Rather, "the test is whether the claim is based on the provider's behavior or practices while acting in [its] professional capacity as a provider of medical services."  *Id.* (quotation marks omitted).

[67]   As our Supreme Court noted in *Howard Reg'l Health Sys. v. Gordon*,

> Indiana courts understand the Malpractice Act to cover "curative or salutary conduct of a health care provider acting within his or her professional capacity," *Murphy v. Mortell*, 684 N.E.2d 1185, 1188 (Ind. Ct. App. 1997), but not conduct "unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment." *Collins v. Thakkar*, 552 N.E.2d 507, 510 (Ind. Ct. App. 1990). . . .
>
> [R]egardless of what label a plaintiff uses, claims that boil down to a "question of whether a given course of treatment was medically proper and within the appropriate standard" are the "quintessence of a malpractice case." [*Van Sice v. Sentany*, 595 N.E.2d 264, 267 (Ind. Ct. App. 1992).]

952 N.E.2d 182, 185 (Ind. 2011).

[68]   We have also noted that:

> A case sounds in ordinary negligence [rather than medical malpractice] where the factual issues are capable of resolution by a jury without application of the standard of care prevalent in the local medical community.  By contrast, a claim falls under the

> Medical Malpractice Act where there is a causal connection between the conduct complained of and the nature of the patient-health care provider relationship.

*B.R. ex rel. Todd,* 1 N.E.3d at 714-15 (citations omitted).

[69] Cavins, at that time a licensed and credentialed practicing physician offering pediatric services, had been administering healthcare to John Doe II since John Doe II was an infant. Cavins had seen John Doe II in the past for yearly physical examinations.

[70] The practice group to which Cavins belonged used the recommended practices of the American Academy of Pediatrics ("AAP") to guide the physicians through the various health stages of children. One of the AAP recommended practices was to discuss various topics with adolescents twelve and older who were near to or entering puberty, including: drugs and alcohol, puberty, abuse, sexually-transmitted diseases, safe sex, and condoms. And it was acceptable by AAP standards to discuss condoms and even demonstrate the proper use of a condom on an object, such as a banana. *See Cavins v. State*, 20A-CR-1213, 2021 WL 221156, at *1 (Ind. Ct. App. Jan. 22, 2021), *trans. denied*.

[71] When the sexual abuse occurred, John Doe II, then twelve years old, was visiting the pediatrician's office for a physical examination that would determine whether John Doe II was fit to play sports at his school. The physical examination included a hernia test, which necessitated Cavins to touch John Doe II's testicles and penis, as well as a discharge test, where Cavins ran his fingers down the shaft of John Doe II's penis. John Doe II did not know

the purpose of the tests, but he was not upset by the administration of the hernia test because Cavins had performed the test before. *See* Appellant's Appendix, Volume II at 242-45. And there existed a legitimate medical purpose for Cavins to touch John Doe II's genitalia. However, Cavins, under the guise of providing John Doe II with sex education and information regarding condom use, then proceeded to stroke John Doe II's penis; place a condom on the boy's penis; remove the condom; then, using a paper towel, wipe off the boy's penis. And this underlying misconduct was at the very core of what Cavins, as John Doe II's pediatrician, was supposed to do – that is, provide health care or professional services in the form of a routine physical examination. At just twelve years old, John Doe II's ability to distinguish between when the legitimate part of the physical examination ended and the sexual abuse began, let alone prevent the abuse, was limited.

[72] Other states have found that sexual abuse that occurs during medical treatment constitutes medical malpractice. For example, in *Doe 56, et al. v. Mayo Clinic Health System – Eau Claire Clinic, Inc.*, 369 Wis.2d 351, 880 N.W.2d 681 (2016), the Wisconsin Supreme Court reasoned that, *generally speaking*, where minor patients are sexually assaulted by their doctor during a genital examination (that is, where the doctor physically manipulated boys' penises), the sexual assault is an intentional act that should be pursued as an intentional tort in the civil or criminal area and *not* under a claim of medical malpractice. The Wisconsin Supreme Court added, however, that *"[w]hen there exists . . . a legitimate medical purpose for a genital examination, a claim can fall within medical*

*malpractice.*" *Doe 56*, 369 Wis.2d at 357, 880 N.W.2d at 684 (emphasis added)[12]; *see also J.W. v. B.B.*, 2005 WI App 125, ¶ 10-11, 284 Wis.2d 493, 501, 700 N.W.2d 277, 281 (Ct. App. 2005) (finding that digital-rectal prostate examinations done as part of a pre-employment physical properly fell within the confines of medical malpractice where the physician had a legitimate medical purpose or reason for the alleged inappropriate touching).

[73] *St. Paul Fire & Marine Ins. Co. v. Asbury*, 149 Ariz. 565, 720 P.2d 540 (App. 1986), involved a gynecologist who was accused of improperly manipulating his patients during gynecological examinations. *See* 720 P.2d at 541. In *Asbury*, the Arizona Court of Appeals addressed the question of whether a physician's sexual assault of a patient was covered by malpractice insurance, acknowledging that, generally, sexual assault by a physician on a patient is not covered by malpractice insurance. However, the court adopted an exception to that rule for sexual assaults that are "intertwined with and inseparable from the services provided." *Asbury*, 149 Ariz. at 567, 720 P.2d at 542.[13]

---

[12] Ultimately, the Wisconsin Supreme Court in *Doe 56* determined that the minor patients and their parents could maintain an action for medical malpractice against the physician and the medical clinic and that a three-year statute of limitations period applicable to the causes of action began to run from the date the physician last touched the patients' genitals during an examination. *Doe 56, et al. v. Mayo Clinic Health System – Eau Claire Clinic, Inc.*, 369 Wis.2d 351, 880 N.W.2d 681 (2016).

[13] The *Asbury* court found that injuries sustained in a sexual assault that took place during a gynecological examination were covered as injuries caused by the "providing or withholding of professional services." *St. Paul Fire & Marine Ins. Co. v. Asbury*, 149 Ariz. 565, 566, 720 P.2d 540, 541 (App. 1986) (internal quotation marks omitted). The court rejected the argument that the alleged acts of improper clitoral manipulation during the gynecological examination were unprofessional and, therefore, not covered by malpractice insurance. *Id.*

[74]   In *Princeton Ins. Co. v. Chunmuang*, 151 N.J. 80, 698 A.2d 9 (1997), another case addressing whether a physician's sexual assault of a patient was covered by malpractice insurance, a seventeen-year-old female was sexually assaulted during a gynecological examination performed by Chunmuang, the attending physician. Specifically, the patient had made an appointment to see Chunmuang because she was experiencing monthly cramping but had not yet menstruated. Chunmuang touched the patient inappropriately and sexually assaulted her during the examination. The patient did not return for a follow-up visit with Chunmuang because he had made her "feel dirty." 151 N.J. at 84, 698 A.2d at 10. And, while she continued to experience cramping and had not yet menstruated, she was not able to seek medical assistance from another gynecologist because of the emotional distress that resulted from her examination by Chunmuang.[14]

[75]   The court in *Chunmuang* reasoned that based on the malpractice insurance policy language, the court "[did] not find it necessary to rely on the reasoning in *Asbury* that a sexual assault during a gynecological examination is more

---

[14] The issue addressed by the New Jersey Supreme Court in *Princeton Ins. Co. v. Chunmuang*, 151 N.J. 80, 698 A.2d 9 (1997), was whether an exclusion from coverage in a medical malpractice insurance policy for "injury resulting from [the physician's] performance of a criminal act" insulates the insurer from liability for compensatory damages awarded to the insured's patient in an action based on a sexual assault by the insured physician in the course of a gynecological examination. 151 N.J. at 82, 698 A.2d at 10. The court held that "claims based on injuries caused by a physician's criminal conduct are properly excluded from coverage under the policy at issue. [The insurance carrier] is not responsible to [the patient] for the damages she suffered as a result of Chunmuang's sexual assault." 151 N.J. at 100, 698 A.2d at 19. The court remanded the matter to afford the patient "the opportunity on remand to produce proof of damages caused by Chunmuang's malpractice that is separable from his criminal conduct." 151 N.J. at 101, 698 A.2d at 19.

intertwined with the professional services sought than a sexual assault in the course of another type of physical examination." 151 N.J. at 97, 698 A.2d at 18. The court added, "[W]e do not find it necessary to rely on *Asbury* to find that the acts that are the basis of Chunmuang's civil liability, in addition to being criminal, *also* constituted malpractice that would be covered by the policy were it not for the criminal-acts exclusion." 151 N.J. at 97, 698 A.2d at 18 (emphasis added). The court then determined that "the important question" was "simply whether a substantial nexus exists between the context in which the acts complained of occurred and the professional services sought." *Id.* And the court found it had "no difficulty in concluding that [Chunmuang's bad] acts constituted a 'medical incident' as defined by Chunmuang's malpractice policy" because the acts complained of by the patient "*took place in Chunmuang's office in the course of what he represented to be a medical examination*[, and t]hose acts were possible only because the patient entrusted herself to the physician's care for the purpose of receiving diagnosis and treatment for a medical problem." 151 N.J. at 97-98, 698 A.2d at 18 (emphasis added).

[76] In the case before us, as in *Doe 56*, *J.W.*, *Asbury*, and *Chunmuang*, *supra*, there was no distinct separation between the treatment Cavins administered to John Doe II and the sexual abuse Cavins perpetrated on the patient. While Cavins had a legitimate medical purpose for touching John Doe II's genitalia, the sexual abuse occurred as part and parcel of a physical examination that was improperly administered and departed from accepted standards of health care. Cavins, *under the guise* of a proper examination, sexually abused the patient,

and, thus, committed malpractice. Simply put, during a legitimate examination, Cavins departed from medically accepted practices thereby injuring the patient and committing medical malpractice. What the majority, in our case, fails to recognize is that, essentially, John Doe II was injured by Cavins' failure to administer a proper physical examination.

[77] And to the extent that the majority argues a lay jury, without the aid of expert medical testimony, could determine whether Cavins' misconduct was malpractice, the doctrine of res ipsa loquitur is an accepted exception to the need for expert testimony and that not every act that a lay jury might find appalling or, at first blush, tangential to medical treatment, falls outside the scope of the Act.[15] I recognize that not all claims against health care providers constitute medical malpractice, but we have such a case before us. Claims sounding in ordinary negligence attributed to misconduct on the part of the health care provider may not rise to the level of medical malpractice. And simply because a bad act occurs in a doctor's office that, in and of itself, does not bring the bad act within the confines of medical malpractice. *See Madison Ctr., Inc.*, 853 N.E.2d at 1288. However, the majority has eliminated from the confines of the Act all acts of sexual abuse that occur during medical treatment under every set of circumstances and in every context. I am not convinced that in Indiana, this is the intended purpose of the Act. *See Cmty. Health Network,*

---

[15] Expert testimony is not required when the factfinder can understand that a health care provider's conduct fell below the applicable standard of care without technical input from an expert witness. *See Syfu v. Quinn*, 826 N.E.2d 699, 703 (Ind. Ct. App. 2005).

*Inc. v. McKenzie*, 185 N.E.3d 368, 375 (Ind. 2022) (noting, "[The Act] is in derogation of the common law and should be strictly construed against imposing limitations on a claimant's right to bring suit.").

### *A Negligent-Credentialing Claim Can Be Supported By Other Misconduct Committed By A Health Care Provider*

[78]   As noted initially, with negligent-credentialing claims, there are two components, pursuant to the Act:  (1) an underlying claim of misconduct within the physician-patient relationship that might rise to medical malpractice (as it does here); and (2) underlying misconduct that should have affected the hospital's credentialing of the physician.  Yet, regarding these components, as I will further explain below, there can be no free-standing, standalone negligent-credentialing claims.

[79]   The predicate claim for a negligent-credentialing action has an additional criterion:  it must be based upon a bad act or misconduct that is *directly related* to the patient-physician relationship – specifically, a direct relationship between the patient and the doctor in light of the doctor's capacity as a doctor – that results in underlying liability.  For example, a negligent-credentialing claim would not exist if no bad act had been inflicted upon that specific patient within the relationship with that specific doctor.[16]

---

[16] This is to say, for example, a patient of a hospital cannot bring a negligent-credentialing claim against the hospital based upon a chance encounter with a physician who has privileges at the hospital but is not the patient's treating physician.

[80]    To be clear, it is not necessary that two separate acts of misconduct occur. Instead, just one underlying bad act can trigger an inquiry into the credentialing of the doctor. Again, I emphasize that the conduct that gives rise to the cause of action must be at least tangentially related to the services the physician performed.

[81]    For purposes of the components as applied to the instant case, I acknowledge that first and foremost, there must be some relationship between the patient and the physician and the alleged misconduct on the physician's part. And, I note, this factor further narrows the group of viable negligent-credentialing claims and, therefore, would not open the floodgates to baseless litigation.

[82]    Such negligent-credentialing claims will necessarily allege some misconduct on the part of the physician that proximately caused a patient's alleged injury. If this were not so, any alleged bad act on the part of physician might lead to a claim of negligent credentialing. In other words, if there is no direct connection between the alleged misconduct and the relationship that exists, at that time, between the patient and the physician – in the doctor's capacity as a doctor – then the alleged misconduct would not support a negligent-credentialing claim or trigger an inquiry into whether a hospital should have extended privileges to the doctor. *See, e.g.*, *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 546 (Tex. 2004) (noting, without negligent treatment, a negligent credentialing claim could not exist) (internal citation omitted).

[83]    It is important to note there are a number of nonmedical occurrences that could/should cause a hospital to reconsider credentialing this doctor, such as touching someone inappropriately at a social gathering or committing theft. But because these activities do not involve a relationship to the doctor as a doctor performing conduct tangentially related to the services for which the victim interacted with the doctor, these claims are outside the instant case.

[84]    However, there is conduct that would not fall within the medical malpractice statute, yet it causes injury to a person and is so related to the doctor-patient relationship that it supports a claim of negligent credentialing, such as:

- Spreading malicious gossip about a patient to people without a medical need to know;
- Revealing personal and private information to people without a medical need to know;
- Failing to follow basic hospital safety protocols such as securing bed rails after an examination;
- Embracing unsupported medical treatment theories that delay a person's appropriate and proper treatment.

[85]    As such, it is imperative that we examine the physician's misconduct from a global perspective and in the complete context of the circumstances that gave rise to the misconduct. We should examine *together* the relationship between the misconduct that occurred and the *result* of that misconduct in light of whether the misconduct should have affected the hospital's credentialing of the physician.

[86] If, as the majority instructs, we limit our approach in determining negligent-credentialing claims to whether the underlying misconduct must constitute medical malpractice, we examine the misconduct through too narrow a lens, which can result in circumstances where potentially successful negligent-credentialing claims may be improvidently denied.

[87] Therefore, when presented with a negligent-credentialing claim, instead of merely focusing on the underlying misconduct to determine whether the misconduct constitutes *medical malpractice per se*, the proper approach is to first determine whether there is any underlying alleged misconduct which should bear on the hospital's decision whether to extend hospital privileges to the physician.

[88] So, in sum, there can be no free-standing, standalone claim for negligent credentialing. However, I reiterate that there are two components to determine negligent-credentialing claims, pursuant to the Act: (1) an underlying claim of misconduct that might rise to medical malpractice; and (2) underlying misconduct that should have affected the hospital's credentialing of the physician. Thus, in the case before us, even if Cavins' misconduct does not rise to the level of medical malpractice, it is clear that the conduct arose due to the patient's direct relationship with the physician; and, therefore, it is possible that the misconduct may trigger on the patient's part an inquiry into whether the Hospital should have extended privileges to Cavins.

*Floodgates to Litigation*

[89]     Approaching negligent-credentialing claims by first examining the underlying alleged misconduct, notwithstanding whether or not the conduct amounts to medical malpractice per se, does not expand the Act's application and does not create a separate, standalone cause of action that would increase the number of such claims. *See, e.g.*, *G.F. v. St. Catherine Hosp., Inc.*, 124 N.E.3d 76, 84-85 (Ind. Ct. App. 2019), *trans. denied*.

[90]     Without question, for a negligent-credentialing claim to survive, there still must be underlying misconduct and proximate causation between the negligent credentialing and the underlying conduct. Furthermore, this approach does not conflict with the purpose of the Act or that of a medical review panel – that is, to "encourage the mediation and settlement of claims and [to] discourage the filing of unreasonably speculative lawsuits." *Johnson v. St. Vincent Hosp., Inc.,* 273 Ind. 374, 388-89, 404 N.E.2d 585, 595 (1980), *overruled on other grounds by In re Stephens*, 867 N.E.2d 148 (Ind. 2007). It is this approach that remains faithful to the Act's purpose.

[91]     Importantly, this approach limits rather than opens the floodgates to or encourages a plethora of baseless, speculative negligent-credentialing claims or claims that attempt to bootstrap and convert common-law-negligence claims into statutory medical malpractice, as the majority asserts has occurred in the case before us. On the contrary, adopting this approach facilitates expediency in adjudicating negligent-credentialing claims and encourages mediation and settlement by involving a medical review panel early in the matter and

requiring, when appropriate, expert medical testimony to prove or disprove the negligent-credentialing claims. It is clear that medical credentialing requires consideration of the multi-faceted factors that trained medical professionals have based on their training and education that lay people do not possess.

### Expert Medical Testimony is Necessary in Deciding Negligent-Credentialing Claims

[92] Additionally, I note that the credentialing process is a medical decision that commonly requires explanation by a medical expert. Generally, the process is beyond the scope of the common knowledge of ordinary laypersons. And it is not reasonable to believe that a layperson would be familiar with a hospital's credentialing process – a complex process involving numerous steps such as screening physicians, verifying physicians' ability to practice, and determining which procedures and services a physician is competent to perform and deliver. After all, it is medical experts who make the credentialing decisions.[17]  *See* Ind. Code §§ 16-21-2-5, -7.  And, consequently, in the larger context of negligent-credentialing claims, expert testimony is required to establish the standard of

---

[17] *But cf. Martinez v. Oaklawn Psychiatric Ctr., Inc.*, 128 N.E.3d 549 (Ind. Ct. App. 2019), *clarified on reh'g*, 131 N.E.3d 777, *trans. denied*, 140 N.E.3d 286 (Ind. 2020) (David, J., dissenting) (concluding, where residential assistant in group home caused injury to plaintiff's leg that resulted in plaintiff's death, "I believe a lay jury could assess whether [the *residential assistant's*] actions were tortious or not without applying a medical standard of care.  Whether [the *residential assistant*] was negligent is not something beyond the knowledge of the jury and I'm not sure what a panel of healthcare providers could make clear here.").  However, I note that the facts and circumstances in the case before us differ significantly from those in *Martinez*.

care the hospital owed the patient and how the hospital breached the standard of care.

[93] Regarding the necessity of expert testimony in negligent-credentialing cases, the Montana Supreme Court observed in *Brookins*, the following:

> It has been noted that "[a]ll courts that have looked at the question have concluded that expert testimony is necessary to establish the standard of care owed by a hospital, or whether the hospital has been negligent." Benjamin J. Vernia, *Tort Claim for Negligent Credentialing of Physician*, 98 A.L.R. 5th 533, 553 (2002) (internal citation omitted). The courts that have already addressed this question have reasoned that the process through which a hospital credentials a doctor to use its facilities is outside the knowledge of a common person. *See e.g. Johnson v. Misericordia Cmty. Hosp.*, 99 Wis.2d 708, 301 N.W.2d 156, 172 (1981) ("[S]ince the procedures ordinarily employed by hospitals in evaluating applications for staff privileges are not within the realm of the ordinary experience of mankind . . . expert testimony was required to prove the same."); *Neff v. Johnson Meml. Hosp.*, 93 Conn.App. 534, 889 A.2d 921, 928 (2006) ("we hold that the parameters of a hospital's judgment in credentialing its medical staff is not within the grasp of ordinary jurors.").
>
> * * *
>
> We agree with other courts that the process of physician credentialing can be complicated and that the reasonable care a hospital must undertake in credentialing a doctor is not readily ascertainable by a layman.

2012 MT at ¶ 62, 367 Mont. at 213, 292 P.3d at 361-62 (internal quotation marks and citation omitted.)

Simply put, the knowledge of the credentialing process necessary to determine negligent-credentialing claims is outside of the purview of non-doctors and nonmedical professionals. And I proffer that if we present negligent-credentialing claims to a jury absent expert testimony, we potentially open the door to visceral reactions by the jury to conduct on the part of the doctor that may have no effect on the hospital's decision to credential the doctor, *e.g.*, seemingly innocuous gossip about someone not associated with the doctor's office or regarding a patient.

If we follow the majority's approach in determining negligent-credentialing claims, we thwart the Act's broader purpose of fostering the prompt litigation of medical malpractice claims. *See, e.g.*, *Ellenwine*, 846 N.E.2d at 666. By *not* requiring expert testimony regarding the credentialing decision – that is, testimony provided by the medical professionals who made the credentialing decision in the first place – we run the risk of opening the floodgates to litigation. The lack of expert testimony essentially sets the bar for negligent-credentialing claims too low, leading to drawn out litigation and a reduction in settlements. *See, e.g.*, *Lake Imaging, LLC*, 182 N.E.3d at 210. And, above all, we risk inviting outcomes where health care providers wrongly prevail on summary judgment, resulting in the loss of a plaintiff's viable claim of negligent credentialing.

*Conclusion*

In conclusion, Cavins' sexual abuse of John Doe II constitutes medical malpractice because the misconduct was at the very core of what Cavins, as

John Doe II's attending physician, was supposed to do – that is, perform a physical examination on John Doe II. Finding this conduct falls within the Act defeats the Fund's objection. However, whether or not Cavins' misconduct, or any alleged misconduct, constitutes medical malpractice is irrelevant to accessing the Act under a negligent-credentialing claim. While any number of bad acts on a doctor's part can affect credentialing, a negligent-credentialing claim falls under the Act, ordinarily requiring an opinion by a medical review panel and, ultimately, expert testimony to decide the claim. And, at the end of the day, there still must be proximate causation between the negligent credentialing and the underlying misconduct. So, even if the majority is correct (and even if the trial court had determined) that, in the instant case, the sexual abuse does not constitute medical malpractice, that conclusion is not dispositive of the Does' negligent-credentialing claim against the Hospital and does not remove the claim from the scope of the Act.

[97] Furthermore, I caution that following the majority's approach invites the risk that some legitimate negligent-credentialing claims will be prematurely disposed of on summary judgment. I believe we have been presented with just such a case.

[98] And, finally, I posit that had the matter before us been addressed as I suggest, this litigation might have been resolved by a full and final settlement of the matter.

Therefore, I would affirm the trial court's denial of summary judgment. In all other respects, I concur with the majority opinion.